Mark C. Manning
Mark C. Manning, P.C.
431 W. 7th Ave., Ste 204
Anchorage, Alaska 99501
(907) 278-9794 Fax: 278-1169
Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| CITICAPITAL COMMERCIAL CORP, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>EGEGIK SPIRIT, official number )<br>299957, her equipment, gear, furniture, )<br>apparel, fixtures, tackle, boats, machinery )<br>anchors and all appurtenances, *in rem, et al.*, )<br>)<br>Defendants. )<br>_____) | IN ADMIRALTY<br>No. A-04-0147 CV (RRB) |

**PLAINTIFF'S SUPPLEMENTAL REPLY MEMORANDUM SUPPORTING
SUMMARY JUDGMENT MOTIONS**

I. INTRODUCTION

Defendants have enjoyed the unusual opportunity to file an Amended Opposition to Plaintiff CitiCapital's two Motions for Summary Judgment. In their July 2005 Oppositions to CitiCapital's motions, Defendants made the extraordinary request that the court either deny the motions due to issues of fact or allow Defendants to depose CitiCapital's loan officer and declarant Senior Vice-president Joseph Pitch. But no Civil Rule 56(f) motion was filed, nor did Defendants claim that they had ever noticed the deposition of Mr. Pitch.

In the interest of avoiding delay that could result from this anomalous procedural approach and in the hope that Defendants' deposition of Mr. Pitch would educate Defendants' counsel about the loan account history at issue in this matter and thereby resolve disputes about it, CitiCapital agreed to allow Defendants to depose Mr. Pitch and to supplement their oppositions based on that deposition. At bottom, CitiCapital's claim

is only about the history of payments on a promissory note, the validity of which is not disputed. CitiCapital's motions really only require the derivation of numbers, by applying arithmetic to payment history and interest accrual in accord with the terms of the note. Any disagreements about steps in this process ought to be resolvable by reference to documents and the checking of the arithmetic. Accordingly, CitiCapital was receptive to proceeding as though a Rule 56(f) motion had been sought and granted, and to resolve any questions about the account formally or informally.

Indeed, CitiCapital embarked on that course before the first opposition was filed, by agreeing to provide account records and serving a response to a Rule 34 request on July 8, 2005, which included a print-out of the account CONTRACT ACTIVITY REPORT. Exhibit 11 ¶ 2. In its July 24 Opposition Memorandum, Woodbine offered no substantial criticism of any aspect of the history in that report.

Defendants commenced Mr. Pitch's deposition on September 21, 2005, but did not complete it that day. Defense counsel had the opportunity to examine Mr. Pitch on the contents of the CONTRACT ACTIVITY REPORT and on the AMORTIZATION SCHEDULE OF PAYMENTS RECEIVED, both of which were made exhibits to the deposition. *Id.* ¶ 3. Defendants never responded to CitiCapital's proposals for completion of the deposition, and they filed no supplemental opposition. *Id.* Consequently, CitiCapital filed its Reply Memorandum on October 7. Defendants subsequently obtained an order allowing them until November 22 to amend their opposition.

Defendants' Opposition and Amended Opposition do not raise any issue that should forestall summary judgment. The Amended Oppositon contains no direct attack on the accuracy of the CONTRACT ACTIVITY REPORT and AMORTIZATION SCHEDULE OF PAYMENTS RECEIVED. In their Amended Opposition, Defendants assert a new unfounded assertion that the note at issue was modified post-arrest, and add the unfounded claim of agreement to modify the mortgages by deleting an insurance requirement. As with the first transparently false claim of modification in their Opposition, the new claim is decisively dismissed by reference to the parties' written communications. Defendants also try again futilely to muddy the waters concerning the account history.

## II. DEFENDANTS' MODIFICATION DEFENSE MUST FAIL.

Defendants argued in their Opposition that CitiCapital, through counsel Manning, agreed after the July 24, 2004, vessel arrests in this action to modify the note's payment schedule to allow the vessels to be released upon cure of the breaches of the mortgages' insurance requirements. Defendants claim that, because of this alleged agreement, they did not have to cure the note's payment defaults, or indeed pay anything at all, to achieve release of the vessels from arrest. Opposition Memorandum at 4-8 and accompanying Ferrari Declaration ¶¶ 2 & 7. Objecting first to this defense because it had never been pled, CitiCapital also showed in its Reply that no reasonable person could conclude from the extensive e-mail and fax communications between Manning and Defendants that any such modification occurred.

Transparently acknowledging the effectiveness of CitiCapital's refutation, in their Amended Opposition Defendants add two more factual inventions: Manning allegedly modified the note on CitiCapital's behalf by agreeing the vessels would be released if (1) "minimal" insurance were obtained and (2) a $125,000.00 payment were made. Amended Opposition at 16. Defendants claim that this modification was breached when they "offered" performance on August 5, 2004, and the vessels were not released. *Id.*

This new invention must fail for the same reasons that the original invention must: it was never pled; and it does not withstand review of the parties' communications. Furthermore, had the alleged offer been made, had the alleged offer been made, it clearly would have been a unilateral offer that could only be accepted by tender of actual performance. Tender was never made.

### A. Defendants may not assert modification of the note and mortgages as a defense because it was not pled.

As with Defendants' first effort, in their Opposition, to assert modification as a defense to the summary judgment motion, the Amended Opposition's second version of modification of both note and mortgages may not be used to avoid summary judgment because modification was never pled. Defendants clearly assert modification of the note and mortgages as a defense to the summary judgment motions. Amended Opposition at 2,

3

3, 12-16. They were required to plead modification as an affirmative defense. Am. Jur. 2d Bills & Notes §662 at 240; Fed. R. Civ. P. 8©. They did not do so.

Defendants second version of events supporting the modification claim is a total surprise. It certainly was not foreshadowed in their counter-claims. The gravamen of the wrongful arrest claim is that

> [s]eizure of one of Woodbine's vessel [sic] for the claimed amount in the complaint was sufficient, but seizure of two vessels was clearly excessive and wrongfully deprived Woodbine of its property and its ability to operate. As such, at all relevant times, the seizure of two vessels for the outstanding obligations of Woodbine was wrongfully [sic], malicious, and designed to harm defendants/counter-claimants and each of them, and was done with conscious disregard and with intent to harm Defendants/counter-claimants."
>
> As a result of CitiCapital's wrongful arrest of excess collateral of Woodbine, Woodbine and Guy Ferrari, Inc. have been damaged in a sum no less than 1.2 million in lost profits, crew fees and charges.

Answer of Woodbine & Guy Ferrari, Inc. to First Amended Complaint and Counter-claim ¶¶ 8 & 9 (forgetting to mention that, in addition to breach of the note, both vessels were in breach of their mortgages' insuring requirements). There is no hint here of an alleged post-arrest agreement to modify the note and mortgages.

Because modification was never pled, no discovery was pursued on the issue. No depositions occurred, which no doubt would have foreclosed the invention of Version II of the modification theory in the Supplemental Opposition. One can only imagine what surprising additional inventions would be heard at trial, if the unpled defense were allowed. Further, there was no discovery of Defendants' capacity to pay the $125,000.00 they claim now to have wanted to pay on August 5, 2005. Virginia Ferrari had told Manning on July 24, 2005, that Defendants were experiencing a "huge cash crunch," and offered to give CitiCapital a container of processed fish valued at about $80,000.00 to resolve matters. Exhibit 11 ¶ 4. Defendants tried to persuade CitiCapital to take fish product until Manning e-mailed Birnberg on July 30, 2004, that CitiCapital would not do so. *Id.*

For lack of a pleading of modification, there has also been no discovery of alleged damages. The counter-claim was so obviously and overwhelmingly without merit that it

4

was unnecessary to take discovery of damages in response to it.

CitiCapital respectfully urges that the court must decline to allow Defendants to raise an unpled affirmative defense in their oppositions.

B. <u>CitiCapital never offered or agreed to modify the note and mortgages to accept "minimal" insurance and $125,000.00</u>.

Alternative inconsistent legal theories may sometimes safely coexist, but a party's alternative inconsistent factual accounts must destroy the party's credibility. In Woodbine's Opposition, which Guy Ferrari, Inc., relies upon, Woodbine claimed that "[a]t the time of arrest, CitiCapital only requested that the vessel [sic] obtain insurance and it would release the vessels." Woodbine's Opposition Memorandum at 2. According to Woodbine, no payment of money was required. Woodbine asserted that it "procured insurance 12 days after the arrest of the vessel and was in substantial compliance with the promissory note and preferred ship mortgage." *Id.* Woodbine asserted further that "Mark Manning, on behalf of Plaintiff, promised that they [presumably CitiCapital] would not act pursuant to the contract provision relating to default if WAFCO [Woodbine Alaska Fish Company] obtained insurance." Woodbine's Opposition Memorandum at 5. Woodbine claimed that "Plaintiff made WAFCO a promise to release the vessel [sic] and permit it to continue operations if WAFCO obtained insurance and started to make payments." *Id* at 8. Woodbine asserted that this alleged agreement modified the note, binding CitiCapital to release the vessels upon re-institution of the insurance required by the mortgages. *Id.* at 4-8. Woodbine contends that CitiCapital breached this agreement when it declined to agree to release the vessels after Woodbine placed insurance, all of which amounts to a wrongful arrest claim.

CitiCapital crushed this fabrication by carefully reviewing the parties' extensive correspondence. Reply Memorandum at 2-9. In Manning's first fax to Virginia Ferrari the day the vessels were arrested, he wrote that "I do not foresee any resolution of this matter unless insurance in substantial conformity with that required by the mortgages is effected." Reply Memorandum Exhibit 5 at 8. CitiCapital showed that this occurred not by about August 3, 2004, as claimed, but rather not until August 13. CitiCapital showed that by this

5

time many communications totally destroying Defendants' claim had occurred: it was overwhelmingly clear that a substantial payment of money was required, and that any offer that might have been made had been terminated by multiple counter-offers.

Recognizing their defeat, Defendants threw a new version up against the wall in their Amended Opposition. Defendants contend that, on CitiCapital's behalf, Manning agreed that the vessels would be released if "minimal' insurance were obtained and $125,000.00 were paid. Amended Opposition at 2-3. Defendants claim they agreed to this on August 5, citing the August 5 Birnberg and August 6 Mueller-Dombois letters. Amended Opposition at 3 & Exhibit A at 3 & 4. Neither an offer nor an agreement ever happened. Manning Declaration, Exhibit 11 ¶ 5.

Defendants' new argument for modification must also fail as a defense to the summary judgment motions for several reasons. First, even if Manning had issued a binding offer at $125,000.00 that could have been accepted by a promise to pay rather than actual payment, the Birnberg and Mueller-Dombois letters simply do not agree to pay $125,000.00. The letters do not contain the figure $125,000.00, or any other number. Birnberg's letter says "we will pay for all arrears on note(s)" and "We offer to pay arrearages again." "Arrears" and "Arrearages" is money which is overdue and unpaid. *Blacks Law Dictionary (5th ed.)*. If one ignored the acceleration of the note, after missing the July 19 payment Defendants were behind 7 $7,323.47 payments, for an arrearage of $43,940.82. *See* Ferrari declaration accompanying Amended Opposition ¶ 2. Manning had e-mailed Birnberg on July 29 that the $125,000.00 approximate figure included arrearages, interest, charges, costs, etc., totaling around $90,000.00, plus an additional payment on the debt. Manning Declaration, Exhibit 11 ¶ 6. Birnberg recognized that the $125,000.00 range was more than the arrearage. Exhibit 11 at 5. An offer to just pay arrears was far shy of $125,000.00, and could not be an acceptance of any offer at that figure.

In asserting the agreement to pay $125,000.00, Defendants cite only the Birnberg and Mueller-Dombois letters. CitiCapital notes, however, that Ferrari claims in paragraph 4 of her declaration accompanying the Amended Opposition that "WAFCO nonetheless agreed to make the $125,000.00 payment." Since Defendants do not cite this passage in their briefing, it is presumably not an averment of fact, but merely Ferrari's reiteration of

6

Defendants' contention based on the Birnberg and Mueller-Dombois letters. CitiCapital would object to treatment of this passage as an averment of fact because it is not accompanied by any foundation showing it is not hearsay or that it is admissible evidence, and not merely a reiteration of Defendants' contention.

Ferrari could not credibly attribute the line to Manning. Defendants have not rebutted Manning's averment that he only spoke to Ferrari on July 24 and 26, 2004. Manning Declaration, Reply Memorandum Exhibit 5 ¶¶ 2, 6-8. The $125,000.00 figure was mentioned for the first time in Manning's July 29 e-mail to Birnberg. Manning Declaration, Reply Memorandum Exhibit 5 at 18; Manning Declaration, Exhibit 11¶ 6. Thus, Ferrari could only be spouting hearsay or argument.

Second, Defendants do not adduce any evidence from which reasonable people might conclude that Manning made a firm offer to accept "minimal" insurance and $125,000.00. It should be noted that the cited Birnberg and Mueller-Dombois letters do not contain words signifying acceptance of an offer. Birnberg wrote "We offer to pay arrearages again." Mueller-Dombois only made reference to having made an offer to pay arrearages in the past. Defendants make no argument to show how these letters constitute acceptances, rather than the offers they expressly refer to.

During the July 24-26, 2004, time frame, Manning was communicating with Ferrari. He faxed Ferrari on July 26 that if Defendants could pay the unaccellerated portion of the debt plus collection costs and if owners could comply with the mortgage's insuring requirements, then "we would invite further negotiations to try to work out details of an agreement." Reply Memorandum, Exhibit 5 at 15. The monetary range indicated was about $88,500.00 to $91,500.00. *Id.* This is an offer or proposal to negotiate, but it is not an "offer" in the contract formation sense. The language does not suggest that assent to a bargain is invited and that assent will conclude the bargain. Restatement (Second) of Contracts § 24.

On July 29, Manning e-mailed Birnberg that if "Woodbine could obtain insurance for the vessel it wishes to operate and could pay something in the $125,000.00 range, CitiCapital would consider working out a deal. *The foregoing is an invitation to negotiate and not a firm offer*." Reply Memorandum, Exhibit 5 at 18 (emphasis added). Again, this

7

is no offer that could be accepted to form an agreement. And it only references release of one vessel. On August 4, Birnberg e-mailed Manning: "What is the likelihood of working out a deal?", showing there was no deal. Manning Declaration, Exhibit 11¶ 6.

The insinuation of a supposed offer to accept "minimal" insurance is a transparent effort to finesse the fact that, in the placement of insurance on August 5, the $5,000,000.00 excess layer required by the mortgages was not included. NAKNEK SPIRIT mortgage, Reply Exhibit 6 at 13; EGEGIK SPIRIT mortgage, Exhibit 6 at 29. Defendants do not point the court to any location in the parties' extensive correspondence where that the word "minimal," or any language suggesting any of the insurances required by the mortgages, could be omitted, appeared. To the contrary, in his first fax to Virginia Ferrari, Manning wrote that "I do not foresee any resolution of this matter unless insurance in substantial conformity with that required by the mortgages is effected." Reply Memorandum Exhibit 5 at 8. The omission of a $5,000,000.00 component of an insurance package cannot possibly produce "substantial conformity." Defendants make no attempt to show otherwise.

Manning e-mailed Birnberg on July 30, stating "As to curing insurance breaches, this will confirm our continued understanding that insurance-related breaches have not been cured in the case of either mortgage. Exhibit 11 at 7. There was no hint that less than full cure would be acceptable. Manning e-mailed again on July 31, referring to the critical hurdle of Defendants' inability to cure insurance-related mortgage defaults. Exhibit 11 at 8. Again there was no mention of less-than-complete cure.

When Birnberg advised on August 5 that Defendants had obtained insurance, Manning inquired "What kind of insurance? Does it comply in all respects with the insurance required by the mortgages?" Exhibit 11 at 9. This is not the question of one who has agreed to waive a requirement for $5,000,000.00 in excess liability coverage. Manning e-mailed again that day: "[P]lease provide me with proof of insurance in compliance with the mortgages ASAP." Exhibit 11 at 10. On August 8, Manning e-mailed "I note the mortgages call for excess risks insurance with aggregate limits of not less than $5MM excess of primary. The documents your office forwarded do not seem to evidence acquisition of this insurance." Exhibit 11 at 11.

8

Defendants have not directed the court to any correspondence from them replying to these e-mails with the assertion or complaint that Manning or CitiCapital had agreed to waive the excess insurance requirement, or that either was failing to honor an offer or agreement to that effect. They have not because there was no such correspondence, nor was there any such verbal response. Manning Declaration, Exhibit 11 ¶ 8.

Further evidence that the offer alleged by Defendants was not made is that CitiCapital did not authorize such an offer. Manning's authority to negotiate on CitiCapital's behalf to try to resolve the matter came through CitiCapital Senior Vice-president Joseph Pitch. Pitch affidavit, Exhibit 10 ¶4. Pitch authorized Manning to offer or propose to negotiate a comprehensive agreement around certain terms at various times. *Id.* An example of what Pitch authorized Manning to pursue is his July 26, 2004, offer to negotiate further terms, if Defendants could first meet the stated threshold requirements. *Id.* Pitch did not consider this a firm offer, meaning an offer containing all required terms, which if accepted would form an enforceable agreement. *Id.* Pitch never authorized a firm offer of the terms Defendants reportedly allege. *Id.* He also did not authorize the making of any other firm offer before or through August 5, 2004. *Id.* He is not aware that a firm offer such as Defendants allege was ever extended, or that any such agreement was reached. *Id.* At no time, August 5 or otherwise, was omission of the $5,000,000.00 layer of insurance acceptable. *Id.*

Third, if Manning's July 29 e-mail were somehow to constitute a firm offer, then it was a unilateral offer, that could only be accepted by performance, in the form of placement of insurance and payment. 17A Am. Jur. 2d §7 at 43 & §8. The letter refers to "payment" of something around $125,000.00, not a promise to pay. CitiCapital would certainly not have agree to accept a promise to pay from obligors who had already breached several promises to pay, and whose representative had said they were "strapped for cash." Defendants offer no evidence they paid or tendered any sum, nor do they offer argument they did or were excused somehow from having to do so, to effectively accept the alleged offer.

Fourth, on July 30, Birnberg e-mailed an offer: "We offer again for an immediate release of both vessels from arrest, to assign collateral to cover the arrears on the payments

and one year advance payments." Woodbine was to continue to seek insurance and would pay insurance costs if CitiCapital were able to restore insurance first. Reply Memorandum, Exhibit 5 at 20. This was a firm offer, terminating any offer Manning might have made. An offer is terminated by rejection and cannot be effectively accepted to create a contract after it has been rejected. 17A Am. Jur. 2d §64 at 95; Restat. (Second) Contracts § §36(1)(a) & 38(1). A counter-offer effects the rejection of an offer. 17A Am. Jur. 2d §65 at 96; Restat. (Second) Contracts §§36(1)(a) & 39.

In summary, Defendants' new variation on the defense of modification must fail because it has never been pled. It must also fail because no reasonable person could conclude from the evidence presented that Manning ever made the alleged offer. Finally, it must fail because the letters Defendants cite as constituting an acceptance simply do not contain language purporting to accept an offer to pay $125,000.00.

### III. CITICAPITAL HAS THOROUGHLY PROVEN UP ITS ENTITLEMENT TO PRINCIPAL, INTEREST AND LATE FEES.

Having withdrawn its claim for closing costs from the motion, CitiCapital now seeks only principal of $369,527.62, interest through January 31, 2005, of $47,154.13, and late charges of $9,520.43. Following the filing of CitiCapital's motion in May, Defendants pursued written discovery of CitiCapital's position and deposed Mr. Pitch, before filing their Amended Opposition. They do not specifically attack the accuracy of the AMORTIZATION TABLE OF PAYMENTS RECEIVED or the CONTRACT ACTIVITY REPORT. Their efforts to cast doubt on CitiCapital's numbers are easily dismissed.

A. Principal.

1. <u>CitiCapital's derivation</u>. The note's inception date was November 20, 2001. Amended Complaint Exhibit 1 at 1. The first payment of $7,323.47 was due on December 19, 2001, and successive payments of $7,323.47 were due on the 19th of each month thereafter. *Id.* Each payment was to be used first to pay accrued and unpaid interest, and the balance went to pay down principal. *Id.*

Derivation of the current unpaid balance is a straightforward mathematical exercise that is merely a function of payments made. Review of the AMORTIZATION SCHEDULE OF PAYMENTS MADE shows that a total of 26 monthly payments were made, though 3 payments were lump sums of 2 monthly payments and 1 was of 3. Pitch Declaration, Reply Memorandum Exhibit 8 at 1 ¶ 2 & 2-4. (The $ 8,001.56 payment on April 1, 2002, was $ 7,323.47 on the note and $678.09 for a surveyor's bill. English Declaration, Reply Memorandum Exhibit 6 at 1 ¶ 4.) PAYMENTS MADE are rendered in tabular form in Supplemental Reply Exhibit 10 at 3. The AMORTIZATION SCHEDULE shows how payments were applied to interest and principal, producing a current principal balance of $369,527.62.

A detail of the history of interest accrual and of application of payments to interest and principal, yielding the balance of $369,527.62, appears in the CONTRACT ACTIVITY REPORT. Pitch Declaration, Reply Memorandum Exhibit 8 at 1 ¶ 3 & 9-23.

2. <u>Defendants' position</u>. Defendants continue to claim that the principal balance of the loan at time of arrest in July 2004 was only $334,044.71. Amended Opposition at 18. But they add no support for this figure to their unfounded citation of a *pro forma* in Woodbine's Opposition Memorandum. Opposition Memorandum at 18, evidently relying on the accompanying July 21, 2005, Declaration of Virginia Ferrari ¶9 & Exhibit C thereto.

In their Amended Opposition, Defendants do not attack CitiCapital's record of actual account history in the AMORTIZATION SCHEDULE OF PAYMENTS MADE or the CONTRACT ACTIVITY REPORT. They had deposed Pitch in September 2005, on these reports, and had a full opportunity to develop any rebuttal of them. Manning Declaration, Exhibit 11 ¶ 3.

Defendants also made no effort in their Amended Opposition to rebut CitiCapital's demonstration at page 14 of its Reply Memorandum that the amortization schedule is not pertinent to the calculation of the principal balance as it actually was in July 2004. This schedule is merely a *pro forma* document, generated only for the express purpose of "permitting a fixed schedule of installments...." Note, Amended Complaint Exhibit 1 at 1. This *pro forma* does show how the account history would unfold if payments in exactly the right amounts were made on exactly the right day, and interest were to remain an

11

unvarying 6.08% for the entire life of the loan. Had that occurred up to July 20, 2004, the balance would have been $334,044.71. But CitiCapital has shown that is not what actually occurred; most payments were late, resulting in the accrual of greater amounts of interest than the amounts assumed by the *pro forma*. Consequently, more of each payment went to interest and less to reduce principal. Defendants have not even attempted to argue otherwise.

In their Amended Opposition, Defendants also make no effort to rebut CitiCapital's demonstration at page 15 of its Reply Memorandum that Defendants' assertion that "there *appears* to be a dispute in the amount paid and credited." Woodbine Opposition Memorandum at 10 (emphasis added), citing July 21, 2005, Declaration of Virginia Ferrari ¶12 & Exhibit D thereto. It is crucial that nowhere in their briefing do Defendants assert that all the payments listed in Exhibit D were on the note at issue in this case, or for any reason should have been applied to that obligation. Likewise, in her declaration Ferrari prudently does not actually claim that the pre-note inception payments listed in Exhibit D should for some unfathomable reason have been applied to the note account. Defendants just assert the listed payments were "paid, in fact, to CitiCapital," and hope the court will make the leap they cannot honestly advocate explicitly. Defendants make no effort to rebut CitiCapital's evidence that those pre-note payments were on other obligations, and that $678.09 of the $8001.56 payment went to a surveyor's bill, leaving the $ 7,32347 payment for April 1, 2001. Reply Memorandum Exhibit 6 at 1¶4.

B.   Interest.

1. <u>CitiCapital's derivation</u>. CitiCapital's motion seeks interest through January 31, 2005, the eve of the interlocutory sale of the EGIGIK SPIRIT, of $ 47,154.13. The calculation of this sum is just a matter of arithmetic. Exhibit 10 ¶ 4. The CONTRACT ACTIVITY REPORT, at Reply Memorandum Exhibit 8 page 19, shows unpaid interest of $ 2,811.16 through May 31, 2004, the last day before acceleration of the debt effective June 1, 2004. The note provides for a default rate of interest of 18.0%, which is applied from June 1, 2004. The note also provides for calculation of interest on the basis of a 360 day year, 12 30-day months. Daily interest on $369,527.62 at the rate of 18.0% per 360

12

day annum is $184.7638 per day. Interest from June 1, 2004, though October 31, 2004, totaling 150 days (5- 30 day months) comes to $ 27,714.57. The total of the 2 interest components is $30,525.73.

Interest at the rate of $184.76 per day for November 2004 through January 2005 (3- 30 day months) comes to $16,628.40. (The motion originally sought $ 16,997.92 for this period, counsel having erroneously included the 31st days of December and January in the calculation.) The sum of interest for the entire period comes to $47,154.13.

2. <u>Defendants' position</u>. After a full opportunity to depose Pitch on the calculus of interest, Defendants have not attacked the interest component, other than indirectly through the assertions concerning principal and payments discussed in the preceding section.

C.   Late charges.

1. <u>CitiCapital's derivation</u>. CitiCapital's motion sought charges totaling $9,886.57. It appears that figure erroneously reflected 1 too many late charges, and should be $9,520.43. Exhibit 10 ¶ 4.

The note provides for assessment of a late charge of 5.% of the $7,323.47 monthly payment due, or $366.17. Total late charges can be manually derived by simply reviewing the AMORTIZATION SCHEDULE OF PAYMENTS RECEIVED to determine how many payments were late, and then multiplying the number of late payments by the late charge. The note provided for monthly payments by the 19th of each month, beginning on December 19, 2002. At Exhibit 10 page 3 is a tabulation of payments recorded in the AMORTIZATION SCHEDULE OF PAYMENTS RECEIVED against scheduled payment due dates. There were 26 late payments at $366.17 each, which produces total late charges of $9,520.43. (It appears that CitiCapital managed the account as though the due date was the 20th of each month, evidently reflecting the November 20 inception date of the note or the funding date. If the 20th is used, the number of late payments is unchanged.)

2. <u>Defendants' position</u>. After a full opportunity to depose Pitch on the calculus of interest, Defendants have not attacked the interest component, other than indirectly through the assertions concerning principal and payments discussed in the preceding

13

section.

## IV. THE PREFERRED SHIP MORTGAGES

Defendants have not disputed that CitiCapital held valid and subsisting preferred ship mortgages on the defendant vessels. In their Opposition, they only raised they claim that CitiCapital had no proven adequately that the mortgages had been recorded. Though not conceding the point, CitiCapital filed with its Reply certified copies of certificates of ownership of the vessels, showing the mortgages had been duly recorded. Defendants did not dispute this in their Amended Opposition.

CitiCapital also asserts that it is too late for Defendants to contest the validity of the mortgages. CitiCapital previously moved for and obtained orders for interlocutory sales of the vessels. The right to the sales was premised in part on the existence of valid preferred ship mortgages on the vessels. If that issue were to be contested in this matter, that was the juncture at which it should have been. Grants of the motions determined the issue, and foreclose further contest of it now.

## V. CONCLUSION

CitiCapital respectfully submits that its summary judgment motions should be granted.

DATED this 23d day of December, 2005, at Anchorage, Alaska.

MARK C. MANNING, P.C.
Counsel for Plaintiff

By: _/s/ Mark C. Manning_
Mark C. Manning

14